IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. **02-cv-1153-JLK**

**YOON BOON LEE**,

       Plaintiff,

v.

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, an Illinois corporation**,

       Defendant.

_____

ORDER AND NOTICE OF INTENT TO APPOINT SPECIAL MASTER
_____

KANE, J.

This interminable insurance/automobile personal injury action began as an insurer's Complaint for Declaratory Judgment against its insured in June 2002. It proceeded through extensive motions practice, counterclaims and amendment to a realignment of the parties so that the pedestrian personal injury victim is now the sole Plaintiff in a bad faith action against the insurer as Defendant.[1] As a result, the original December 2002 discovery cutoff date was extended to December 2005. Throughout, disputes related to discovery and the posturing of attorney-client relationships between the insurer, State Farm, its insured, Larry Thorne, and Thorne's State Farm-appointed counsel, John Rodman both here and in related state court proceedings have stymied

---

[1] The insurer's insured, Larry Thorne, was dismissed on stipulation of the parties in May 2003.

deadlines and delayed resolution of dispositive motions. Today, some 3 ½ years after the original action was filed, the case remains mired in discovery and is before me on yet another motion to compel State Farm to produce otherwise privileged documents on grounds that the attorney-client relationships between the insured and State Farm were fraudulently maintained and manipulated to the detriment of Ms. Lee. I am deeply troubled by what I have seen in this case.

On its face, Plaintiff Lee's Motion for Order Compelling Discovery, filed September 19, 2005 (Doc. 204), seeks the production, or review *in camera*, of 600 documents State Farm is withholding on grounds of attorney-client privilege and/or work product protection. Unlike other pre-2002 documents for which claims of privilege have been waived or deemed waived in this case, the documents sought are purportedly the actual litigation files of State Farm's current counsel, created since the filing of this declaratory judgment action in 2002. At the heart of Lee's Motion, however, is the assertion that the privileged nature of these documents is lost when the procedural history of shifting alliances and fraud that has attended her dealings with State Farm make them likely to both confirm and to continue that fraud.

Specifically, Lee argues the documents should be produced based on the crime-fraud exception to privilege and because State Farm is precluded from asserting the privilege based upon its affirmative defense that it relied upon the advice of counsel. I find sufficient indicia of fraud to support the invocation of the crime-fraud exception, and given the procedural history of this case, I rule that the documents must be submitted for

*in camera* review.

## **BACKGROUND AND PROCEDURAL HISTORY**.

The general facts underlying the accident and proceedings to date have been set forth in two previous written decisions: my November 15, 2002 Memorandum Opinion and Order on the purported waiver of attorney-client privilege by the insured, Larry Thorne, when he filed his counterclaim for bad faith against State Farm in this action; and my May 5, 2005 Order denying State Farm's Motions to Dismiss Lee's Amended Complaint or, in the alternative, Motion to Strike certain of her factual allegations.  I recount them briefly as follows:

On March 4, 1998, a car driven by State Farm's insured, Larry Thorne, struck and injured an elderly Yoon Boon Lee as she was walking with the right of way across a marked crosswalk.  Thorne admitted to State Farm the following day that he was under the influence of marijuana at the time of the accident.  Lee, a then-67 year old grandmother, suffered serious injuries from the impact with Thorne's vehicle, including a shattered ankle and damaged shoulder that required extensive surgery to repair.[2]  State Farm concluded Thorne was responsible for Mrs. Lee's injuries and records indicate State Farm's awareness of a "potential aggravated liability situation."  At the time, Thorne was insured by State Farm under an automobile liability insurance policy with limits of

---

[2] In addition to the eight years older she has become since receiving her injuries, Ms. Lee has also been stricken with cancer and has undergone treatment during the pendency of this litigation.

$100,000 per person/$300,000 per accident.

On March 17, 1998, Lee made a time-limited offer to State Farm to settle her claim against Thorne for the $100,000 policy limit. The parties dispute whether State Farm affirmatively rejected the offer, but agree State Farm did not accept the offer nor seek an extension of time past the April 20, 1998 due date. On April 23, 1998, Lee filed suit in state court against Thorne, seeking compensatory and exemplary damages. State Farm retained Rodman to represent Thorne, and directed Thorne to follow Rodman's advice as a condition of preserving insurance protection for Lee's claim. On May 8, 1998, State Farm noted in its claim file that it "should try to settle ASAP" and informed Thorne through Rodman that State Farm would not pay any judgment against him in excess of his policy limits. While Rodman and State Farm engaged in regular contact during Rodman's representation of Thorne, it was not until 2002 that State Farm finally informed Thorne that Lee had offered to settle her claims against him for policy limits in 1998.

In June 1998, Rodman filed an Answer on Thorne's behalf *denying* liability and asserting Lee's comparative negligence as an affirmative defense. During the course of the state court proceedings, Thorne twice gave deposition testimony denying he was negligent in causing Mrs. Lee's injuries and denying the marijuana impaired him in any way. Because punitive damages are not covered by insurance under Colorado law, Lee's counsel, Richard Kaudy, extracted from Rodman an agreement on behalf of Thorne by which Lee would withdraw her punitive damages claim in exchange for Thorne's

agreement to maintain the admissions and denials of liability set forth in his Answer.  In August 1999, Rodman agreed.

On March 6, 2002, after four years in which State Farm's position had consistently been to decline to entertain any settlement in excess of policy limits, Lee approached Thorne with a proposed "Bashor" agreement[3] in which she would agree not to execute against Thorne's personal assets in exchange for a stipulation of judgment in the amount of $2.5 million.  The idea was that Lee would then receive what she believed was the maximum amount of coverage – $100,000 – and the right to proceed against State Farm for the excess judgment on a claim of bad faith.  Rodman advised his State Farm supervisor, Steve Baird, of the proposed pre-judgment agreement and asked Baird to review it.

Unbeknownst to Thorne, State Farm immediately retained Greg Giometti of the law firm of Seaman & Giometti to represent State Farm independently of Thorne and asked Giometti to investigate whether an insured's entry into a pre-judgment agreement for the assignment of a bad faith claim might open the door to denying coverage on grounds of "failure to cooperate" under a policy.  After receiving an affirmative answer, Lee claims Baird, on behalf of State Farm, and with the passive approval of Rodman, embarked on a "scheme" to encourage Thorne to enter into the Agreement with Lee so

---

[3] While the pre-judgment agreement was referred to as a "Bashor"-type agreement, the label is inexact given that it was executed pre- and not post-judgment.

that State Farm, in response, could deny coverage and avoid paying Lee anything under the policy.

To support her claim, Lee points to two letters drafted by Giometti and sent by Baird to Rodman on April 2, 2002, confirming a discussion the two had had on March 28th.  The first is a cover letter sent to Rodman, attaching a second letter that Rodman was asked to pass on to his client, which informed Thorne of State Farm's decision to lift the $100,000 policy cap and agreement to pay any amount of excess judgment against him in the state court action with Lee, less any punitive damages award.  The cover letter states State Farm "would be providing this letter to our insured" and reminds Rodman that the "excess protection does not cover any punitive damage award against Mr. Thorne."  In a draft of that letter, however, which Lee obtained previously in discovery, Baird included the following representation that was deleted in the final:  "At the time we [Baird and Rodman] discussed this, I indicated we would provide this [excess assurance protection letter to Thorne] *if he didn't enter into an agreement with Ms. Lee.  However, we are now providing it to him without any contingency*."  *See* Giometti Facsimile and Drafts, Ex. 5 to Pl. Mot. Compel (emphasis mine).  The implication of the omission, according to Lee, was to encourage Thorne to sign the agreement and unwittingly jeopardize his coverage all together.

In the attached "excess assurance protection [i.e. 'comfort'] letter," moreover, which Rodman was asked to provide to Thorne, State Farm for the first time apprised Thorne of Lee's offer "early in the case, before [the state court] suit was filed" to settle

6

her claim within policy limits and informed Thorne that it had rejected that offer. *See* 4/2/2002 Letter from Baird to Thorne (attached as Ex. 6 to Pl.'s Mot. Compel). State Farm also acknowledged that it had, since then, offered to settle Lee's claim for $100,000 but that Lee had rejected that offer and expressed her intent to proceed to trial. Acknowledging that Thorne "may be concerned about a judgment in an amount above [his] available insurance coverage," State Farm for the first time agreed to cover any excess judgment, less any punitive damages that might be awarded. *Id.* The letter further provided that "[i]n exchange" for the promise to protect him from any compensatory damage award, Thorne would have to "comply with the cooperation clause of [his] policy." *Id.* The letter did not qualify what it meant by "compliance," and certainly did not inform Thorne that entering into the proposed pre-judgment agreement would be viewed by State Farm as an express failure to comply.

The letter to Thorne, in fact, was utterly silent on the fact or impact of the proposed pre-judgment agreement. State Farm's only comments on the pre-judgment agreement were set forth in the cover letter to Rodman, where Baird sought to "clarify that although you [Rodman] have sent me copies of Mr. Thorne's proposed agreement with Ms. Lee, that [sic] State Farm *is not offering any type of input on the content of the agreement, and is not offering any advice or direction on whether Mr. Thorne should sign the agreement.*" Final Cover Letter from Baird to Rodman, dated 4/2/2002 (attached as Ex. 7 to Pl.'s Mot. Compel)(emphasis mine). This representation, occurring at a time when State Farm could not only have offered Thorne "input" on the agreement, but could

7

have directed him *not* to sign it lest he forfeit his right to coverage entirely, supports Lee's contention that she and Thorne were defrauded into executing the pre-judgment agreement which then formed the basis for State Farm's Complaint for Declaratory Judgment in this case.

Significantly, Rodman did not disclose the comfort letter to Lee, which he was obligated to do under the applicable Colorado Rules of Civil Procedure (CRCP 26(a)(1)(D)).[4]  Accordingly, both Lee and Thorne entered into the pre-judgment agreement without critical information both should have had.  Thorne was unaware, although Rodman knew, that he risked losing all coverage for Lee's claims if he signed the agreement.  Lee, and her counsel Richard Kaudy, were unaware of the "comfort" letter and believed Lee's only chance for payment under the policy was to secure the $100,000 policy limits and then to release Thorne personally in exchange for the right to proceed against State Farm on a claim for bad faith.  The parties signed the agreement, the state court entered judgment on it in the amount of $2.5 million plus interest and costs.  State Farm immediately filed this action for declaratory relief seeking to void coverage.

Specifically, State Farm named both Thorne and Lee as Defendants and claimed Thorne's entry into the agreement constituted a breach of his duty to cooperate under the

---

[4]  State Farm originally sought to avoid this conclusion by characterizing the letter as an "offer" for excess coverage only, which would not be subject to disclosure.  This characterization was soundly rejected by Judge Perricone, the judge who presided over the state court action between Lee and Thorne.  *See* discussion of state court proceedings, *infra*.

8

policy that forfeited both his right to coverage and Lee's right to payment.  Lee and Thorne filed counterclaims, and as set forth above, the claims for declaratory relief have been resolved and State Farm has settled with Thorne under terms that finally provided Lee with payment for the injuries she suffered in the accident.  Lee, as the sole remaining counterclaimant, has been redesignated Plaintiff and her action against State Farm for fraud, abuse of process, conspiracy, and outrageous conduct proceeds.

Once the declaratory judgment action was filed and Lee realized not only that State Farm was using her pre-judgment "Bashor" agreement as grounds for denying Thorne any coverage for her injuries, but that State Farm had also failed to disclose its agreement *before* she entered into the prejudgment "Bashor" agreement with Thorne to lift Thorne's policy caps, Lee found herself in the position of being without any right to payment from anyone.  She had waived her right to proceed against Thorne personally, and that waiver was now being used to deny her any right to payment under Thorne's insurance policy.  As a result, Lee immediately moved to vacate the judgment in the state court on grounds of fraud.  As previously mentioned, Judge Perricone was unimpressed by State Farm's attempt to explain away its failure to disclose the April 2, 2002 "comfort" letter it had sent Thorne, finding the letter was clearly a "statement" of coverage rather than an "offer" for coverage that had to be accepted to be binding, and therefore should have been disclosed to Lee before she signed the stipulated judgment against Thorne.  *See* Order dated 1/23/03, Civil Action No. 98cv1760 (Arapahoe County District Court).  As to Lee's claim of fraud, Judge Perricone specifically found as

9

follows:

> [T]he information in the letter is material information which would aid the Plaintiff in making an informed decision, and that in equity and good conscience the Defendant knew that without disclosing the letter the Plaintiff would not be sufficiently advised to make an informed decision when she executed the stipulation for entry of judgment.
>
> The Court further finds that the Plaintiff relied on the insurer's statements, which were contrary to the facts as stated in the letter, that the Defendant knew of should have known that without disclosure of the facts contained in the letter that the Plaintiff would not be sufficiently advised to make a knowing decision when she entered into the stipulation for judgment, that the letter was not disclosed, and the Plaintiff was damaged thereby.

Order pp. 1-2. Judge Perricone concluded the failure to disclose "was done fraudulently" and therefore granted Lee's Motion to Vacate the stipulated judgment. *Id.*

In May 2003, after Judge Perricone's Order, State Farm settled with Thorne on his counterclaims in this case and Mrs. Lee received payment of $400,000 under the policy. Accordingly, all that remains in this case are Lee's claims against State Farm for damages related to its conduct in securing and then using the pre-judgment "Bashor" agreement to avoid paying her for five years after the accident. These claims – for fraud, abuse of process, civil conspiracy, and outrageous conduct – each has survived dismissal under a Rule 12(b)(6) standard. *See* 5/2/2005 Order (Doc. 186), Civil Action No. 02-cv-1153-JLK (D. Colo.).

## **RULING.**

The Motion to Compel seeks the production of 600 documents in State Farm's privilege log based upon the crime fraud exception to the privilege and because State

Farm should be precluded from asserting the privilege based upon its affirmative defense that it relied upon the advice of counsel (Giometti) in its actions related to the pre-judgment agreement forming the basis for its denial of coverage. The documents consist of communications between State Farm and its counsel, both in-house counsel and its reatined counsel, Seaman, Giometti & Murphy, P.C. after the filing of the declaratory judgment action on June 17, 2002. The Motion also seeks an order compelling the disclosure of John Rodman's files, but the parties' dispute regarding those privilege issues have been resolved and Rodman's files (which include the drafts of the 2002 cover letter and attached excess insurance ("comfort") letter have been produced.

As it happens, I am presently engaged in the closing stages of a four-month jury trial in a toxic tort class action and I do not have the time to engage personally in an *in camera* review of 600 documents. Moreover, the intricacies of the claimant-insurance business, the possibilities of additional sparring and document production, as well as an evaluation of the standards of practice engaged in by counsel prompt me to appoint a special master. Because, as I have indicated, I am deeply troubled by what is already of record, I find the appointment of a special master especially appropriate to provide a dispassionate review.

Accordingly, the parties are hereby notified in accordance with Rule 53(b)(1) of my intent to appoint a special master to conduct an *in camera* review of the documents that are the subject of Lee's September 19, 2005 Motion to Compel (Doc. # 204). Any special master will review the claims of attorney-client privilege and attorney work

product and shall make findings and recommendations to the Court in accordance with the procedure set forth in Rule 53.  Compensation for any special master will be allocated between the parties in accordance with the guidelines set forth in Rule 53(h), in accordance with the special master's recommendations.  The parties may suggest candidates for appointment.  The parties' suggestions, and any objections to the appointment of a special master generally, shall be made in the form of written responses to this Order and Notice of Intent to Appoint Special Master on or before January 18, 2005.


Done this 12th day of January, 2006.           **s/John L. Kane**
                                                  SENIOR U.S. DISTRICT JUDGE