IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 02-cv-1153-JLK-PAC

YOON BOON LEE,

Plaintiff,

v.

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, an Illinois Corporation,

Defendant.

---

## SPECIAL MASTER'S REPORT AND RECOMMENDATIONS

---

This matter is before the Special Master pursuant to Judge Kane's Orders of January 20, 2006 and February 13, 2006. The Special Master issues his Report and Recommendations as follow:

## I.  **INTRODUCTION**

This litigation involves a dispute regarding the conduct of Defendant State Farm Insurance Company ("State Farm") in attempting to avoid coverage for liability for personal injuries caused by a State Farm insured in an automobile accident.  Plaintiff Yoon Boon Lee ("Lee"), who was injured in the accident, asserts claims against State Farm for fraud, abuse of process, civil conspiracy and outrageous conduct and seeks an award of both compensatory and exemplary damages.

The immediate issues that require resolution arise from State Farm's claims of attorney-client privilege and attorney work product protection to prevent disclosure to Lee of certain documents in discovery.  On January 20, 2006, the Honorable John L. Kane entered an Order appointing the undersigned as Special Master.  The Order Appointing Special Master states that the assigned task is as follows:

1

> . . . [T]o conduct an <u>in camera</u> review of the documents that are the subject of Lee's September 19, 2005 Motion to Compel. Pursuant to his appointment, the Special Master is authorized to review claims of privilege, attorney work product and to make findings and recommendations to the Court in accordance with Fed. R. Civ. P. 53(f). The Special Master shall include in his findings and recommendation consideration of all applicable rules of professional responsibility adopted by this Court.

Order Appointing Special Master at 1.

The Special Master has reviewed relevant portions of the case file and all of the briefing and case materials that have been presented by the parties, including the depositions of key witnesses and the pertinent deposition exhibits, and State Farm's privilege log and all of the documents in State Farm's <u>in camera</u> submission.  Based on that review, the Special Master concludes that the principal issues to be addressed are:

1)   whether the crime-fraud exception to the attorney-client privilege applies;

2)   whether the crime-fraud exception extends to documents that were prepared after this litigation was filed, under Lee's theory that the prosecution of this action has been a series of continuing acts in the furtherance of a conspiracy that was devised by State Farm and its attorneys to fraudulently avoid paying damages for injuries suffered by Lee that were caused by State Farm's insured;

3)   whether any other grounds exist to avoid or defeat State Farm's claims of attorney-client privilege or attorney work product protection; and

4)   separate and apart from the considerations of attorney-client privilege or work product, whether there are any substantial questions regarding possible violations of any mandatory provisions of the Colorado Rules of Professional Conduct.

The Special Master finds and concludes that the crime-fraud exception applies and that it extends to documents that were prepared after this litigation was filed.  At the outset, the Special Master notes that, as set forth in greater detail in the Conclusions of Law below, the quantum of proof necessary for the application of the crime-fraud exception is a "prima facie showing that the exception applies to each document before the document is actually stripped of its privilege. . . ." A. v. District Court, 191 Colo. 10, 550 P.2d 315, 326 (1976), cert. denied, 429 U.S. 1040 (1977). Any contested findings in the Findings of Fact below are based on the Special Master's review of the record and his determination that Lee has made a prima facie showing to establish these facts that support the application of the crime-fraud exception.  Having made the determination that the crime-fraud exception applies, the Special Master finds and concludes, based on a page-by page review of every document in the in camera submission, that the crime-fraud exception applies to some but not all of the documents for which privilege and/or work product protection have been claimed.  The Special Master has set forth his specific recommendations as to each document in the chart attached as Exhibit 1, adding a column to State Farm's privilege log with the Special Master's recommendations.

In addition to the crime-fraud exception, Lee challenges the claims of privilege and work product based on the "at issue" waiver doctrine.  Further, the Special Master has considered whether State Farm has either failed to establish its claims of privilege or work product or waived its claims by failing to provide the information necessary to support each claim on a privilege log that complies with the requirements of Fed. R. Civ. P. 26(b)(5)(A).  The Special Master has considered these issues in the context of the legal framework below and has set forth his specific recommendations as to each document in the chart attached as Exhibit 1.

The Court's instruction that the Special Master must consider the conduct in this case under all applicable rules of professional responsibility has not affected the Special Master's determination of the privilege and work product issues that have been addressed. See Preamble to the Colorado Rules of Professional Conduct ("these Rules are not intended to govern or affect judicial application of either the attorney-client or work product privilege."). These ethical considerations are for a different purpose than assessing the privilege and work product claims, and they have been undertaken on a different standard of review than the prima facie showing to establish the crime-fraud exception to the privilege. The Special Master views his limited task to be that of identifying any provisions of the Colorado Rules of Professional Responsibility with respect to which, in the judgment of the Special Master, there may be a "substantial question" as to whether the conduct at issue may have violated mandatory professional responsibilities. The purpose of this inquiry is not to make findings or conclusions, but rather, it is to aid the Court in the determination of whether any ethical issues warrant further action.

## II.  FINDINGS OF FACT

On March 4, 1998, Larry Thorne ("Thorne"), a State Farm insured, was the driver of an automobile that struck Lee, a pedestrian crossing an intersection with the light. Lee sustained serious injuries including a right proximal humerus fracture, a right ankle fracture, a right rotator cuff tear, scrapes and bruises and an L5 compression fracture. She also sustained damage to her mouth and teeth. She was subsequently diagnosed with post-traumatic vision syndrome, closed head injury and depression.

The accident investigation report disclosed that Thorne had used marijuana shortly before the accident. He was ticketed for vehicular assault, driving under the influence and careless driving, and he was also charged with possession of marijuana.

At the time of the accident, Thorne's insurance policy with State Farm provided liability coverage in the amount of $100,000.  On March 17, 1998, before instituting suit, Mr. Richard Kaudy ("Kaudy"), who was counsel for Lee, made a time-limited demand for a policy limit settlement on State Farm.  At or about the time that Kaudy made this demand, State Farm opened a claim file and initiated a claim log.  However, State Farm did not convey to or inform Thorne of the demand. When State Farm failed to respond within the established deadline the demand was withdrawn and litigation ensued.

On April 23, 1998, Kaudy filed a complaint in the Arapahoe County District Court, asserting a negligence claim for Lee against Thorne and seeking exemplary damages. That civil action, with the case caption <u>Yoon Boon Lee v. Larry Thorne</u>, Case No. 98CV1760, is hereinafter referenced as the "underlying case" or the "state court case."

After the complaint was filed, State Farm retained Mr. John Rodman ("Rodman") as counsel for its insured.  The Special Master finds that Rodman is a seasoned insurance attorney who is intimately familiar with the complex coverage issues that were presented in this case.  At the time of his retention on this matter, Rodman had a long history with State Farm.  In the preceding eight years, State Farm had paid Rodman $6,107,937.67 in relation to 354 claims and 2,589 transactions for his work defending State Farm insureds and representing State Farm directly.

Rodman filed an answer on behalf of Thorne in which the defendant denied liability and pled the affirmative defense of comparative negligence.  Although in his discovery deposition Thorne denied the use of marijuana was a cause of the accident, the fact of his use of marijuana significantly increased his risk of liability for exemplary damages.  This risk of liability personally exposed Thorne because State Farm's insurance policy provided no coverage for exemplary damages.

The Special Master finds that Rodman was fully apprised, early on, of a conflict between the interests of State Farm and Thorne. On July 29,1999, Kaudy wrote a letter to Rodman, setting forth in detail his analysis of the Thorne position vis a vis State Farm in view of its failure to settle the case for the policy limit demand. This letter included Kaudy's suggestion that Thorne may have a remedy against State Farm as a result of State Farm's alleged bad faith, and that this remedy could provide a means by which Thorne could avoid personal financial exposure from compensatory damages in excess of the policy limit. Further, in this letter Kaudy proposed that Lee would withdraw her claim for exemplary damages in exchange for Thorne's stipulation to liability, and he related that a State Farm adjuster had stated that she saw no financial advantage to Thorne in this proposal, even though it would have relieved him of his personal exposure to exemplary damages.

On March 6, 2002, Kaudy initiated discussions with Rodman to explore the possibility of entering into a stipulation to liability and the amount of damages, with an assignment to Lee of Thorne's rights to coverage under the insurance policy. This agreement is described herein as the "Bashor" agreement, shorthand for the case of Northland Ins.Co. v. Bashor,177 Colo. 463, 494 P.2d 1292 (Colo. 1972).[1]

On March 11, 2002, Rodman forwarded to State Farm a copy of the draft Bashor agreement sent to him by Kaudy. There is no dispute that Rodman had discussions regarding the Bashor

---

[1] The facts in Northland Ins.Co. v. Bashor involved an assignment of rights post-judgment. Here the agreement was made before trial with the expectation that the entry of any judgment would be based on a stipulation between the parties as to both liability and damages. The distinction can be significant as it relates to the enforceability of the agreement. See Ross v. Old Republic Ins. Co. 134 P.3d 505, 511 (Colo. App. 2006) (a pre-judgment Bashor is not a valid Bashor agreement), cert. granted, (Colo. Oct 16, 2006) (The Colorado Supreme Court granted certiorari on several issues including: "Whether court of appeals' holding that the settlement agreement was not a valid Bashor agreement conflicts with the supreme court's decision in Northland Insurance Company v. Bashor?"

agreement with Mr. Steven Baird ("Baird"), the State Farm "Team Manager" assigned to the case. However, the State Farm claim log that had been kept since Kaudy had made the pre-complaint demand contains no detailed notes or records of the discussions between Baird and Rodman relating to the proposed Bashor agreement, either as to the terms of the agreement being discussed or as to Baird's reaction and discussions with others in the State Farm organization. The failure to make entries regarding these communications of critical information contrasts conspicuously with the rest of the log which otherwise contains extensive entries regarding the various case activities. The Special Master finds that the failure to maintain its claims log under these circumstances where State Farm's routine practice was to make entries reflecting these communications gives rise to an inference that this failure was deliberate and intentional to avoid the creation of records that would have been unfavorable to State Farm.[2]

On March 21, 2002, State Farm retained the services of the law firm of Seaman, Giometti & Murphy, P.C. As stated in the engagement letter, this firm was hired "to represent State Farm and provide legal advice with respect to its rights and obligations in connection with the allegations of bad faith and the proposed 'Bashor' agreement." Both Mr. Gregory Giometti (hereinafter "Giometti") and Mr. Thomas Seaman (hereinafter "Seaman") provided legal services to State Farm in connection with this matter.

On March 28, 2002, Giometti performed research described in his billing as: "Research Re: Whether Insured Entering into Pre-judgment Agreement with Injured Plaintiff for Assignment of

---

[2] See e.g. Broccoli v. Echostar Communications Corp., 229 F.R.D. 506, 511 (D. Md. 2005) ("The evidence of a regular policy at EchoStar of 'deep-sixing' nettlesome documents and records (and of management's efforts to avoid their creation in the first instance) is overwhelming. . . . EchoStar clearly acted in bad faith.").

Bad Faith Claim Against Insurer Constitutes Failure to Cooperate under Policy."

On March 29, 2002, Giometti sent to Baird, by facsimile, a copy of Hamilton v. Maryland Casualty Company, 27 Cal.4th 718, 41 P.3d 128, 117 Cal. Rptr. 2d 318 (Cal. 2002), a California case holding that a stipulation between parties to an entry of judgment containing an agreed amount of money as damages would not be binding on an insurer not a party to the stipulation.

On March 30, 2002, Rodman sent a letter to Thorne enclosing a copy of the proposed Bashor agreement. He stated in this letter, inter alia, that "State Farm has had an opportunity to review the agreement. . . ." There is no dispute that Thorne agreed to this Bashor proposal on the advice of Rodman, believing that he (Thorne) was cooperating with a strategy that had been approved by State Farm. It is further undisputed that Rodman did not advise Thorne of any potential consequences if State Farm asserted that the Bashor violated the cooperation clause in the State Farm policy.

On April 2, 2002, Baird forwarded a letter to Rodman  "attach[ing] the excess assurance protection ("EAP") letter we discussed on March 28, 2002" and "requesting [Rodman] provide a copy to Mr. Thorne."  The EAP letter stated  State Farm's intention to remove the policy's limits of $100,000.00 for compensatory damages and further provided:

> In exchange for our promise to protect you from any compensatory damage award, you must comply with the cooperation clause of your policy and fulfill all policy duties and conditions throughout the entire claims process.

The EAP letter contained no explanation of the circumstances under which the cooperation clause might come into play and no explanation of how entering into the Bashor agreement might violate this provision. The April 2, 2002 cover letter from Baird to Rodman that accompanied the EAP letter acknowledged that State Farm had been informed of the proposed Bashor but it did not disclose State Farm's position regarding its impact on the cooperation clause. That letter contained the following language:

. . . I would like to clarify that although you have sent me copies of Mr. Thorne's proposed agreement with Ms. Lee, that State Farm is not offering any type of input on the content of the agreement, and is not offering any advice or direction on whether Mr. Thorne should sign the agreement. Please call me if you have any questions.

The Special Master finds that when Baird sent the EAP letter to Rodman, Baird had full knowledge of the negotiations relating to the Bashor, and he knew that State Farm would take the position that the Bashor violated the cooperation clause in Thorne's policy under the reasoning of Hamilton v. Maryland Casualty Company.  In making this finding, the Special Master notes that Baird had requested and received from Giometti editorial changes to both the EAP letter and the cover letter before sending them to Rodman.

The Special Master further finds that State Farm's position that the Bashor would violate the cooperation clause in Thorne's policy was a material fact that should have been disclosed to Thorne and that these letters were intentionally drafted to conceal that material fact from Thorne.

The Special Master further finds that, based on the facts and circumstances and Rodman's previous experience representing State Farm, Rodman knew, when he received the EAP letter and the cover letter, that State Farm would take the position that the Bashor violated the cooperation clause.  Even if Rodman did not have actual knowledge of this fact, he had a duty to confirm State Farm's position regarding the effect of the Bashor on the cooperation clause to be able to properly advise Thorne.[3]

---

[3]  Further, applying the standard of care in Colorado, an attorney owes a duty to his client to employ that degree of knowledge, skill, and judgment ordinarily possessed by members of the legal profession in carrying out services for his client.  One of these obligations is anticipating reasonably foreseeable risks. Temple Hoyne Buell Foundation v. Holland & Hart 851 P.2d 192, 198 (Colo. App. 1992).

The Special Master further finds that the EAP letter was a material fact that should have been disclosed to Kaudy during the negotiations and communications regarding the proposed Bashor agreement.  There is no dispute that after his receipt of the EAP letter, Rodman did not disclose the EAP letter to Kaudy or otherwise inform him that State Farm had lifted the policy limit as to compensatory damages.

On April 4, 2002, Giometti provided a twenty-nine page opinion letter to State Farm analyzing three issues: (1) whether the pre-judgment assignment of Thorne's bad faith claim to Lee would be binding and create a cause of action against State Farm, and, as a corollary issue, whether State Farm, if found to have acted in bad faith, would be bound to pay the amount of the stipulated judgment, $2,500,000, as damages;  (2) whether, if Lee and Thorne were to enter into the stipulation, State Farm could deny coverage on the ground that Thorne has breached his duty to cooperate with State Farm; and (3) evaluation of the merits of Lee's contention that State Farm acted in bad faith by failing to accept her time-limited settlement demand.  This letter contained the following conclusion:

> During our telephone conversations over the past week, we discussed the idea of sending Thorne an excess protection letter.  It is my understanding that this has now been done.  However, it appears that Thorne may still enter in the stipulated agreement for entry of judgment with a covenant not to execute and an assignment of his 'bad faith' claim.  If he does enter into such a transaction, it is my opinion that State Farm would not be bound by the amount of the stipulated judgment and that the stipulated judgment and assignment would probably not even give rise to a viable bad faith claim against State Farm.  If the agreement were determined to be binding against State Farm, the company would have an argument that Thorne's entry into the agreement resulted in a forfeiture of coverage.  Finally, if the assigned bad faith claim against State Farm were allowed to proceed, State Farm would probably prevail on the merits of the case.

The Special Master finds that, if as of the date of this letter State Farm had not already informed Rodman of the positions expressed in this letter, State Farm had a duty to do so before Thorne entered into the Bashor agreement.  Further, the Special Master finds that if Rodman had not been actually informed of the positions expressed in this letter before Thorne entered into the Bashor, based on Rodman's experience and the facts and circumstances presented, he either knew or should have known that State Farm would take these positions.

On April 15, 2002, Lee and Thorne entered into the Bashor agreement which was approved as to form by Rodman and Kaudy.  In that agreement, the parties stipulated to the entry of judgment in favor of Lee and against Thorne in the amount of $2,500,000.00, with a covenant not to execute on that judgment and an assignment to Lee of Thorne's rights under State Farm policy.

The Bashor agreement contains a representation by Thorne at ¶ 18 that:

> . . . Larry D. Thorne wishes to preserve his own financial assets and peace of mind and believes he has cooperated fully with State Farm Mutual Automobile Insurance Company duing the pendency of the Civil Action No. 98 CV 1760 filed against him by Yoon Boon Lee.  He has not been provided any information in any way indicating that by entering into this agreement he has failed to cooperate with any insurer, including State Farm Automobile Insurance Company; . . . .

The Special Master finds that, at the time of this agreement, State Farm and its attorneys, Giometti and Seaman, were  aware of this representation by Thorne, State Farm's insured, and they were aware that State Farm had already determined that it would take the position that its insured was violating the cooperation clause by entering into this agreement.  Under these circumstances, State Farm and its attorneys owed a duty to State Farm's insured to correct his misunderstanding of this material fact before he entered into the agreement.  Further, State Farm and its attorneys owed a duty to Lee to correct the false impression created by this material representation and to disclose that State Farm had already determined that it would take the position that its insured was violating

11

the cooperation clause by entering into this agreement.

The Special Master further finds that at the time that Lee and Thorne entered into the Bashor agreement, Rodman knew or should have known that State Farm had already taken the position that this agreement violated the cooperation clause of Thorne's policy.  Even if one were to assume arguendo that Rodman did not have actual knowledge of this fact, he was duty-bound, as an attorney representing Thorne, to advise his client that State Farm had not approved this agreement and to evaluate the risks to his client in entering into the Bashor without State Farm's approval.  In making this finding, the Special Master notes that Baird testified in deposition that, even though he professed not to recall discussing this issue with Rodman, he believes that "Rodman is a good attorney and would know that that is a possibility."

The Special Master further finds that while Rodman was ostensibly representing Thorne, he was also acting as State Farm's agent in assisting State Farm to orchestrate this transaction in a fashion to conceal material facts from both Thorne and Lee.

In making these findings the Special Master has considered Rodman's billing records that reflect numerous communications with Baird before his client entered into this agreement and, as well, the conspicuous absence in the State Farm claim log of any detailed notes setting forth the discussions that Rodman had with Baird leading up to this agreement.

Further, the Special Master has considered  the deposition testimony of Rodman in which he professes a failure to remember any of the substance of his discussions with Baird regarding the proposed Bashor agreement before its execution.  The Special Master finds that this testimony lacks credibility.

Further, in making these findings, the Special Master reviewed the two volumes of

videotaped deposition of Baird to observe his demeanor at the deposition and to assess his credibility. The Special Master finds that Baird was not credible in testifying that he did not recall the substance of his discussions with Rodman regarding the cooperation clause issues before Thorne and Lee entered into the Bashor agreement.

On June 14, 2002, judgment was entered against Thorne in the underlying action for the stipulated amount, plus interest and costs. Just three days after the entry of judgment, on June 17, 2002, State Farm represented by Seaman and Giometti, filed this current action in this Court, naming both Lee and Thorne as defendants and seeking, inter alia, a declaration of no coverage based on the allegation that Thorne had breached his insurance contract with State Farm by failing to cooperate. The Special Master finds that State Farm's filing of the declaratory judgment action in this Court, just three days after the entry of judgment in the state court action, was the execution of a plan that had been developed by State Farm, Giometti, Seaman and Rodman before Thorne and Lee had entered into the Bashor agreement.

On July 8, 2002, after the filing of the declaratory judgment action, Kaudy learned of the existence of the EAP. Then, on July 22, 2002, Kaudy filed an answer and counterclaim on behalf of Lee in the instant action, and he later filed an amended answer and counterclaim on August 9, 2002.

On July 31, 2002, Mr. Robert Baldwin (Baldwin), representing Thorne, filed an answer and a counterclaim for breach of contract, bad faith, willful and wanton breach of contract, outrageous conduct and violations of the Colorado Consumer Protection Act.

The materials reviewed by the Special Master include the opinion letter, dated September 24, 2002, authored by Richard Laugesen, Esq.  Mr. Laugesen is an expert in the area of insurance law and practice retained on behalf of Lee.  In his letter, Mr. Laugesen opined that State Farm became liable for any excess damages of Lee by unreasonably failing to respond to her time-limited demand under the rule of <u>Aetna Casualty & Surety Co.v. Kornbluth</u>. 28 Colo. App. 194, 471 P.2d 609 (Colo. App. 1970) (<u>cert</u>. <u>denied</u>), and by doing so without informing Thorne of the opportunity to resolve the matter within liability insurance protection.  Mr. Laugesen further opined that:

> In April and May of 2002, State Farm committed additional tortious acts. With knowledge that Mr. Thorne was about to enter into an assignment agreement [recognized in Colorado as a 'Bashor'-type agreement] and without disclosing to Mrs. Lee's attorney its acknowledgment of responsibility for the entirety of any judgment that might be rendered against Mr. Thorne [as it should have done back in July of 1999], State Farm had the attorney it appointed for Mr. Thorne go through with the assignment agreement with the attorney for Mrs. Lee, including the entry of the stipulated Judgment. State Farm then pounced on Mr. Thorne and Mrs. Lee, claiming that the assignment agreement [which State Farm had through its agent John Rodman induced and encouraged] was a breach of Mr. Thorne's 'duty to cooperate,' which allegedly voided any coverage under the State Farm policy.  After inducing the agreement State Farm then immediately embroiled Mrs. Lee and Mr. Thorne in expensive federal court litigation.

> In my opinion, this latest conduct by State Farm was deceitful, highly inappropriate and compounding of its other previous conduct. Such actions, in my opinion, were and are outrageous within the contemplation of C.J.I. (4th) 19:2 and 23:1.

> *       *       *

> It is further my opinion that the Declaratory Judgment action commenced and being prosecuted by State Farm is baseless and frivolous. It is actually worse than baseless and frivolous in that it is an attempt to use the federal judicial system to assist State Farm in its perpetrating and attempting to benefit from its own deceptive and tortious misconduct.

> *       *       *

In my opinion, all of State Farm's conduct since July of 1999 has been at

14

least 'willful and wanton' as defined by C.J.I. (4th) 9:32 and C.R.S. 13-21-102. It is
further my opinion that State Farm's willful and wanton conduct has been continuing
since at least July 1999 through the date of this report. As a result, the provisions of
C.R.S. 13-21-102(3) pertaining to entitlement to enhanced exemplary damages are
applicable.

The Special Master finds Mr. Laugesen to be a highly regarded and well qualified expert in

the area of insurance law and practice in Colorado and gives great weight to his opinions expressed

in his letter and at his deposition.

The Special Master finds that the conspiracy continued after the filing of the declaratory

judgment action.  On September 23, 2002, in furtherance of the strategy that had been developed by

State Farm and its attorneys, State Farm filed a motion to establish that Thorne had waived his

attorney-client privilege with Rodman by filing a counterclaim alleging State Farm's bad faith.  State

Farm premised its motion on the "at issue" waiver recognized by the Colorado Supreme Court in

Mountain States Telephone & Telegraph Co. v. DiFede, 780 P. 2d 533 (Colo. 1989).

Both Lee and Thorne responded to the motion with arguments pointing the Court towards

a partial waiver resolution, expressing concern that State Farm was attempting to further create a

dilemma for Thorne by arguing that he must maintain the privilege to defend the underlying suit and

waive it to allow State Farm to defend his claims against it in the declaratory judgment action.  The

Motion was denied by the Honorable John L. Kane in his Memorandum Opinion and Order, dated

November 15, 2002.

On December 30, 2002, as a part of the continuing conspiracy, State Farm filed its Motion

for Partial Summary Judgment on its declaratory judgment claim.  The Special Master finds that by

seeking to achieve a determination that the Bashor was not binding on State Farm, when State Farm

had orchestrated the events leading to execution of this agreement, this motion was an act in

15

furtherance of the strategy that had been developed by State Farm, Giometti, Seaman and Rodman before Thorne and Lee had entered into the Bashor agreement.

While this litigation proceeded, on July 30, 2002, Kaudy moved to vacate the judgment in the state court case. The implication of the Kaudy motion to vacate was the resurrection of the underlying state court case by Lee against Thorne, in which State Farm would have the responsibility to defend Thorne.

On January 23, 2003, Senior Judge Gaspar F. Perricone, sitting on the state court case by assignment of the Colorado Supreme Court, considered and granted the motion to set aside the judgment, finding that it had been procured by fraud. His findings are central to the issues that the Special Master has been assigned to consider and are, therefore, quoted herein, as follows:

The salient issues which the Court must decide are:

1. The character of the April 2, 2002 letter from the insurer to the Defendant. Is it an offer which requires an acceptance before disclosure pursuant to Colo.R.Civ.P. 26(a)(1) is required, or is the letter only a modification of an existing insurance policy?

2. Are the facts contained in the letter material?

3. Was the failure to disclose the letter fraud?

The Court finds that the letter is not an offer that requires an acceptance before it is an agreement between the insurer and the Defendant. On the contrary, the Court finds that the letter is a statement by the insurer that the policy limits have been expanded, and that no additional consideration exists. That portion of the letter that requires the Defendant to comply with the term of the policy is only an affirmation of the Defendant's then-existing contractual duties.

The Court further finds that the information in the letter is material information which would aid the Plaintiff in making an informed decision, and that in equity and good conscience the Defendant knew that without disclosing the letter the Plaintiff would not be sufficiently advised to make an informed decision when she executed the stipulation for entry of judgment.

16

The Court further finds that the Plaintiff relied on the insurer's statements, which were contrary to the facts as stated in the letter, that the Defendant knew or should have known that without disclosure of the facts contained in the letter that the Plaintiff would not be sufficiently advised to make a knowing decision when she entered into the stipulation for judgment, that the letter was not disclosed, and the Plaintiff was damaged thereby.

Therefore, the Court finds that the failure to disclose was done fraudulently, and the Plaintiff's Motion to Vacate Judgment is granted. The judgment entered on June 14, 2002 be vacated and held for naught.

The Special Master notes that there are substantial questions – not addressed by the parties in their briefing – regarding whether the findings of Judge Perricone are binding in this litigation based on either claim or issue preclusion. The Special Master does not apply either claim or issue preclusion in this Report, leaving those questions to be addressed by the Court if later raised by either of the parties. Nevertheless, the Special Master finds, based on his independent review of the materials presented, that Judge Perricone's findings are persuasive and well-supported, and based on the record provided, the Special Master adopts the same findings as are set forth therein.

Following Judge Perricone's ruling, on February 3, 2003, State Farm moved for the withdrawal of Plaintiff's Motion for Partial Summary Judgment that had been filed on its declaratory judgment claim. Further, Lee moved to amend her counterclaim in this action to add claims of fraud, civil conspiracy and abuse of process.

On April 3, 2003, this Court recognized the changing legal framework of this litigation by ordering the realignment of parties, with Lee and Thorne designated as plaintiffs and State Farm as defendant, and ordered Lee and Thorne to file revised pleadings in the form of complaints no later that April 25, 2003.

On June 26, 2003, Kaudy was granted leave to withdraw as counsel in this case, and attorneys from Barnhart, Ekker & McNally, L.L.P., and Paoli and Brown, P.C., entered their

appearances for Lee, and, on April 25, 2003, they filed an Amended Complaint on behalf of Lee, alleging fraud, civil conspiracy, abuse of process and outrageous conduct.

On May 5, 2003, Thorne and State Farm stipulated to the dismissal of Thorne's claims against State Farm.

On May 31, 2003  Seaman, Giometti & Murphy, P.C., moved to withdraw as counsel for State Farm, and Jon Sands, Esq., entered his appearance.

### Proceedings on the Motion to Compel

On July 5, 2005, Lee served written discovery entitled "Supplemental Request for Admissions and Request for Production of Documents to Defendant" seeking communications between State Farm's agents and employees and Seaman.  In response to this request, State Farm agreed to produce all communications involving Seaman up to June 17, 2003, the date the declaratory judgment action was filed, but objected to discovery of communications after the filing. State Farm filed a fifty-eight page privilege log, addressing communications between Seaman and State Farm after the filing of the action.  Lee moved to compel the production of the post-filing items listed on the privilege log and argues that State Farm should be ordered to produce all communications with Seaman based upon the crime-fraud exception to the privilege and the "at issue" waiver doctrine.

### III.   CONCLUSIONS OF LAW

#### Attorney Client Privilege and the Crime-Fraud Exception

Pursuant to Federal Rule of Evidence 501, in this diversity case privilege is governed by state

law.  In Colorado, the attorney-client privilege is codified in C.R.S. § 13-90-107(1)(b) as follows:

> An attorney shall not be examined without the consent of his client as to any
> communication made by the client to him or his advice given thereon in the course
> of professional employment; . . . .

In Wesp v. Everson, 33 P.3d 191, 196-7 (Colo. 2001), the Colorado Supreme Court

explained the public policy underlying the attorney-client privilege and acknowledged its tension

with the judicial system's truth-seeking goals. The Court stated: "[T]he harshness of the operation

of the privilege is softened by a number of exceptions and by the doctrine of waiver, all of which

are consistent with the goals of the privilege."  Id. at 197.

Colorado has limited the scope of the attorney-client privilege in matters where the

communications between a client and his attorney are made for the purpose of aiding the

commission of a future crime or a present continuing crime.  A. v. District Court, 550 P.2d at 324;

Losavio v. District Court, 188 Colo. 127, 533 P.2d 32 (Colo. 1975).  This exception was extended

to cases involving civil fraud in  Caldwell v. District Court,  644 P.2d 26 (Colo. 1982) and is now

known as the "crime-fraud" exception to the attorney-client privilege.

As stated above, the quantum of proof necessary for the application of the crime-fraud

exception is "a prima facie showing that the exception applies to each document before the

document is actually stripped of its privilege and admitted into evidence." A. v. District Court, 550

P.2d at 326 (1976).  "A prima facie showing exists where the plaintiff raises a reasonable inference.

. . ."  First Horizon Merchant Services, Inc. v. Wellspring Capital Management, LLC, No.

05CA2370, slip op. at 2, 2007 WL 1149980 (Colo. App. April 19, 2007).   "Inferences from circumstantial facts may frequently amount to full proof of a given theory, and may even be strong enough to overcome the force and effect of direct testimony to the contrary."  The Wenona, 86 U.S. 41, 58 (1873); Pregeant v. Pan American World Airways, Inc., 762 F.2d 1245, 1249, n. 5 (5th Cir. 1985).   "[Federal]Rule[of Evidence] 401 declares a liberal relevancy standard that incorporates notions of both materiality and probativity.  U.S. v. McVeigh,  153 F.3d 1166, 1190 (10th Cir. 1998).  A fact is material or "of consequence" under Rule 401 "when its existence would provide the fact-finder with a basis for making some inference, or chain of inferences, about an issue. . . ." Cook v. Rockwell Intern. Corp, No. Civ.A. 90-CV-00181-J, slip op. at 59, 2006 WL 3533049 (D. Colo. Dec. 7, 2006).

In the present case, analysis of the crime-fraud exception to the attorney-client privilege requires consideration of the elements of rules related to non-disclosure or concealment.  As stated by the Colorado Court of Appeals in Bair v. Public Service Employees Credit Union, 709 P.2d 961, 962 (Colo. App. 1985) (quoting from the Restatement (Second) of Torts § 551(2) (1977)):

> One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated
>
> *        *        *
>
> (e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect the disclosure of those facts.

In addition, the Amended Complaint contains a claim for civil conspiracy.  In this claim, Lee alleges, inter alia:

> The actions of State Farm, Rodman and /or Seaman in concert by words and conduct conspired to accomplish the unlawful goal of defrauding Lee exemplified

20

by deceiving Lee into signing the agreement with Thorne through the events described above, by committing a fraud upon Lee as determined by Judge Perricone, in using that unlawful fraud as part of its initiation for its declaratory judgment suit filed against Lee in federal court, and in using that action to perpetuate its fraud against Lee, all of which has caused Lee injuries, damages and losses in amounts to be determined at trial.

There are five elements required to establish a civil conspiracy in Colorado.  There must be: (1) two or more persons, and for this purpose a corporation is a person;  (2) an object to be accomplished;  (3) a meeting of the minds on the object or course of action;  (4) one or more unlawful overt acts;  and (5) damages as the proximate result thereof.  Jet Courier Service, Inc., an Ohio Corporation, v. Anthony Mulei and American Check Transport, Inc.,771 P.2d 486, 498 (Colo. 1989).  "The essence of a civil conspiracy claim is not the conspiracy itself, but the actual damages resulting from it."  Id. at 502.  Moreover, "[a] conspiracy may be implied by a course of conduct and other circumstantial evidence. . . .  There must be some indicia of agreement in an unlawful means or end."  Schneider v. Midtown Motor Co., 854 P.2d 1322, 1326-7 (Colo. App. 1992).

To establish a claim for fraudulent concealment or non-disclosure, the plaintiff must show that the defendant had a duty to disclose the information.  Bair, 709 P.2d 961 at 962.  Whether a defendant had a duty to disclose a particular fact is a question of law.   See Van Winkle v. Transamerican Title Insurance Co., 697 P.2d 784 (Colo. App. 1984).  A person has a duty to disclose to another with whom he deals facts that "in equity or good conscience" should be disclosed.  See Eckley v. Colorado Real Estate Commission, 752 P.2d 68 (Colo. 1988).

Under Colorado law, there is a quasi-fiduciary relationship between an insurer and its insured.  In American Family Mutual Ins. Co. v. Allen, 102 P.3d 333, 342 (Colo. 2004), the Colorado Supreme Court stated:

21

>An insurer must deal in good faith with its insured. The insurance contract imposes a 'quasi-fiduciary' relationship between the insurer and insured that imposes an implied covenant of good faith upon the insurer.  This special relationship gives rise to a separate action in tort when the insurer breaches its duty of good faith and fair dealing.

(Citations omitted); see also Farmers Group Inc., v. Trimble, 691 P.2d 1138, 1141 (Colo. 1984).

Applying these legal principles to the facts of this case, the Special Master concludes that Lee has made a prima facie showing that State Farm and its attorneys, Seaman and Giometti, and Rodman, as Thorne's counsel but also acting as State Farm's agent, knew and concealed the fact from Thorne that State Farm would consider Thorne in breach of the cooperation clause of his policy if he entered into the proposed Bashor agreement.  Further, Lee has made a prima facie showing that State Farm and its attorneys and agent knew and concealed the fact from Thorne that after creating the false impression that Thorne was cooperating with a strategy approved by State Farm and its attorneys, State Farm intended to file a lawsuit naming Thorne as a defendant. These facts that were concealed were  material and State Farm and its attorneys and agent concealed and failed to disclose these facts with the intent of creating a false impression of the actual facts in Thorne's mind. Further, Thorne by acting in reliance on a misunderstanding of the true facts, allowed State Farm to set in motion the events that resulted in the prosecution of the declaratory judgment action.

Separate and apart from the duties owed to Thorne, State Farm and its attorneys and agent can be liable in damages under the facts of this case to Lee.  See Holmes v. Young, 885 P.2d 305, 311, (Colo. App. 1994); Zimmerman v. Dan Kamphausen  971 P.2d 236, 241 (Colo. App. 1998).[4]

---

[4] See also Anstine v. Alexander, 128 P.3d 249, 256 (Colo. App. 2005) ("the law does not insulate aiders and abettors from liability simply because they acted in the course of fulfilling separate and distinct duties as lawyers"), rev'd on other grounds, Alexander v. Anstine, 152 P.3d 497, 503 (Colo. 2007) ("We save for another day the question of whether an attorney can ever be liable for aiding and abetting a breach of fiduciary duty to a non-client.").

The Special Master concludes that Lee has made a prima facie showing that State Farm and its attorneys and Rodman "in equity and good conscience," should have disclosed to Lee the information in the EAP letter before Lee signed the Bashor agreement.  Further, they should have disclosed that material facts had been concealed from Thorne and that he (Thorne) was entering into the Bashor agreement with the misimpression that he was cooperating with a strategy that State Farm had approved when, unbeknownst to Thorne, State Farm planned to file the declaratory judgment action against both Thorne and Lee as soon as the ink on their signatures on the Bashor agreement had dried.  The Special Master concludes that  Lee has made a prima facie showing that State Farm and its attorneys, Seaman and Giometti, and Rodman as State Farm's agent, concealed these facts from Lee, and that Lee relied to her detriment on false information when she entered into the Bashor agreement.

Pertinent to the issues raised in the Motion to Compel, the Special Master concludes that Lee has made a prima facie showing that State Farm's filing of the declaratory judgment action was in furtherance of a plan to perpetrate a fraud that had been developed by State Farm, its attorneys and its agent before the Bashor was signed and that the fraud continued after the filing of the declaratory judgment action.  The actions in furtherance of this plan include the filing of State Farm's Motion Re: Waiver of Attorney-Client Privilege, filed September 23, 2002, and State Farm's Motion For Partial Summary Judgment, filed on December 30, 2002.  These acts continued up through the ruling of Judge Perricone when State Farm's actions were exposed and the case that State Farm and its attorneys and agent had devised disassembled.

As stated above, the application of the crime-fraud exception requires a review of each document for which the privilege is claimed.  Applying the conclusions set forth herein, the Special Master's recommendations regarding disclosure based on the crime-fraud exception are set forth in

the attached chart (Exhibit 1), containing recommendations as to each document.

## At Issue Waiver

In <u>Mountain States Telephone & Telegraph Co. v. DiFede</u>, 780 P. 2d at 543, the Colorado

Supreme Court adopted the "at issue" waiver to the privilege as the law in Colorado.  In that case

the Court stated:

> Although we have not directly addressed this issue before, it is clear from our review of cases from other states that by placing in issue a confidential communication going directly to the claim or defense, a party impliedly waives the attorney-client privilege with respect to that communication.

<u>Id</u>.; <u>see also</u> <u>Metro Wastewater Reclamation Dist. v. Continental Cas. Co.</u>,  142 F.R.D. 471, 477 (D.

Colo. 1992) ("a party impliedly waives the attorney-client privilege when he places a claim or

defense at issue, and the document or information in question has a direct bearing on that claim or

defense").  This doctrine is based on principles of fairness.  <u>See</u> <u>e.g.</u> Restatement (Third) of Law

Governing Lawyers § 80 cmt. b and Reporter's Note (2000).

Lee, as the party seeking to overcome the privilege, has the burden of proving waiver.

<u>DiFede</u>, 780 P.2d at 542.  In <u>DiFede</u>, the Colorado Supreme Court held that a privilege holder

impliedly waives the privilege when the following factors are shown:

> (1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party;  (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case;  and (3) application of the privilege would have denied the opposing party access to information vital to his defense.

780 P.2d at 543-44.

In consideration of the application of the <u>DiFede</u> factors, in the context of the findings of fact set forth above, the Special Master concludes first that the present assertion of the privilege was ultimately a result of an affirmative act by State Farm. This litigation was originally filed by State Farm, and State Farm persisted in its strategy until after the ruling by Judge Perricone. Second, by pursuing this strategy, State Farm placed at issue in this litigation the communications that it now claims to be privileged. Third, having reviewed the documents in the <u>in camera</u> submission, the Special Master concludes that the application of the privilege would deny Lee of vital information that she would have needed to defend against the declaratory judgment action and to prosecute her claims. Further, as previously noted, State Farm, itself, has relied upon the "at issue" waiver doctrine as a basis for its motion that asserted that Thorne had waived privilege.

The Special Master concludes that the <u>DiFede</u> factors have been established by the facts of this case and the "at issue" waiver should be applied accordingly. Applying the conclusions set forth herein, the Special Master's recommendations regarding disclosure based on the "at issue" waiver are set forth in the attached chart (Exhibit 1), containing a recommendation as to each document for which the privilege has been claimed.

## **The Privilege Log**

The Federal Rules of Civil Procedure sets forth the requirements for asserting claims of privilege on a log in accordance with the provisions of Fed. R. Civ. P. 26(b)(5)(A) as follows:

(5) Claims of Privilege or Protection of Trial-Preparation Materials.

(A) Information Withheld. When a party withholds information otherwise discoverable under these rules by claiming that it is privileged or subject to protection as trial-preparation material, the party shall make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or

25

protection.

The failure to comply with this rule results in a waiver of the claims of privilege. <u>See</u> <u>Atteberry v. Longmont United Hosp.</u>, 221 F.R.D. 644, 649 (D. Colo. 2004) (failure to produce a privilege log or production of an inadequate privilege log may be deemed a waiver of the privilege asserted); <u>Pham v. Hartford Fire Insurance Company</u>, 193 F.R.D. 659, 662 (D. Colo. 2000) (same); <u>see also</u>, <u>Sonnino v. University of Kansas Hosp. Authority,</u> 221 F.R.D. 661, 668-669 (D. Kan. 2004) ("It is well settled that when a party withholds documents or other information based on a privilege or work product immunity, the 'party shall make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection.'"); <u>Horton v. U.S.,</u> 204 F.R.D. 670, 673 (D. Colo. 2002) ("the cases imposing the requirement of a privilege log do not carve out of the requirement documents between a lawyer and client created after the initiation of the litigation."); <u>McCoo v. Denny's, Inc</u>., 192 F.R.D. 675, 680 (D. Kan. 2000).

This case law is grounded in the bedrock principle that the party asserting the claim of privilege bears the burden of establishing its applicability. <u>See</u> <u>Wesp</u>, 33 P.3d at 196 -197 (attorney-client privilege). The Colorado rule requiring a privilege log (C.R.C.P. 26(b)(5)) is patterned after the federal rule, and the law of waiver for failure to comply with this rule applies whether under Colorado or federal law. <u>See</u> <u>Alcon v. Spicer</u>, 113 P.3d 735, 741-2 (Colo. 2005) ("when a party wishes to assert privilege in response to a discovery request he or she must notify the party seeking disclosure by providing a privilege log identifying the documents withheld and explaining the privilege claim.").

The Special Master has been provided with State Farm's privilege log. The log is presented

in the form of a spreadsheet with headings enumerating the following subjects:

    1.     document number;

    2.     bates number (Seaman);

    3.     nature of document, communication or other material;

    4.     date of origin; and

    5.     reason for not producing or not disclosing.

While these categories purport to comply with the requirements of the privilege log rule, the Special Master concludes that in numerous instances, State Farm has failed to provide information sufficient to satisfy these requirements.  Examples of this failure are State Farm's blanket assertion of privilege in the billing records and numerous facsimile cover sheets, requiring the Special Master to review these materials without having been provided the specific information required to assist the Special Master to evaluate the claims.

Applying the conclusions set forth herein, the Special Master's recommendations regarding disclosure based on waiver for State Farm's failure to submit a proper privilege log are set forth in the attached chart (Exhibit 1), containing a recommendation as to each document for which the privilege has been claimed.

### Billing Records

In general, billing records are not accorded privileged status unless specific entries contain privileged communications.  In <u>Wesp</u>, 33 P.3d at 199, n. 15, the Colorado Supreme Court stated:

> Certain other types of information communicated between attorney and client are also not protected by the privilege and may be discovered.  For instance, an attorney generally may not refuse to answer questions about the identity of a client and fee arrangements.

In <u>United States v. Hodgson</u>, 492 F.2d 1175, 1177 (10th Cir. 1974), the United States Court

of Appeals for the Tenth Circuit considered a response to a subpoena seeking attorney fee related

records in a tax matter.  The Court held:

> Attorney Hodgson made a blanket claim of the privilege.  A general refusal to cooperate is not enough.  He must normally raise the privilege as to each record sought and each question asked so that at the enforcement hearing the court can rule with specificity.

State Farm has routinely applied the privilege to billing records.  In many instances these

records run to many pages. The privilege has been asserted in blanket fashion relating to all entries

within a given document.  Each document varies in length, but the format contains references to

date, initials of the provider, time reference in tenths of hours and usually a cryptic one line

reference to the activity.  The claim of  privilege does not address in detail the elements or specific

items within these records for which the privilege is claimed, leaving it to the Special Master to try

to isolate those entries for which privilege might apply.

Applying the conclusions set forth herein, the Special Master's recommendations regarding

disclosure of the billing records are set forth in the attached chart (Exhibit 1), containing a

recommendation as to each document for which the privilege has been claimed.

### Miscellaneous Non-Privilege Documents

In numerous instances State Farm has included documents in the privilege log such as fax

cover sheets, emails, and other transmission documents that do not, on their face, appear to contain

any information that is protected by application of the attorney-client privilege. The Special Master

has considered these documents under the principles articulated above and has set forth his

recommendations in the attached chart.  Exhibit 1.

### Attorney Work Product

State Farm's assertions of the attorney work product doctrine raise issues that must be

considered separately from the attorney-client privilege issues addressed above.  See e.g. Hickman v. Taylor, 329 U.S. 495, 508 (1947) (attorney-client privilege does not apply to writings that reflect an attorney's mental impressions, conclusions, opinions, or legal theories); In re Foster, 188 F.3d 1259, 1272 (10th Cir. 1999) (work product is broader and distinct from attorney-client privilege). While in diversity cases state law governs claims of attorney-client privilege, the application of the work product doctrine is governed by a uniform federal standard embodied in Fed.R.Civ.P. 26(b)(3). Frontier Refining, Inc. v. Gorman-Rupp Co., Inc., 136 F.3d 695, 702 (10th Cir. 1998).

The party claiming work product must meet its burden of demonstrating that each of the documents to which work product protection is claimed was in fact prepared in anticipation of litigation.  Grand Jury Proceedings v. U.S., 156 F.3d 1038, 1042 (10th 1998); Lifewise Master Funding v. Telebank, 206 F.R.D. 298, 304 (D.Utah 2002) ("the mere allegation of [the work product doctrine's] application is insufficient.").  "Because the work product doctrine is intended only to guard against divulging the attorney's strategies and legal impressions, it does not protect facts concerning the creation of work product or facts within the product."  Id. at 304.

The contours of the application of the work product doctrine were addressed by the Honorable John L. Kane in Marcin Engineering, LLC, v. Founders at Grizzly Ranch, LLC,  219 F.R.D. 516, 525 (D. Colo. 2003) as follows:

> This doctrine applies to documents and tangible things prepared by a party in anticipation of litigation. It does not apply to facts underlying or contained in such documents. The party resisting discovery bears the burden to timely show that documents constitute work product.  Even if the resisting party carries this burden, it nonetheless must produce the work product if the requesting party shows it has substantial need of the material and that it is unable without undue hardship to obtain the substantial equivalent of the material by other means.

(Citations omitted).

Applying these legal standards, the Special Master has reviewed each claim of work product protection and has set forth his recommendations as to each claim in the attached chart.  Exhibit 1.

## IV.  RULES OF PROFESSIONAL CONDUCT

D.C.COLO.LCivR 83.4, Standards of Professional Responsibility, states as follows:

> . . . [T]he rules of professional conduct adopted by the Colorado Supreme Court and in effect on the effective date of these rules are adopted as standards of professional responsibility applicable in this court.

Pursuant to the Order Appointing Special Master, the Special Master has considered the conduct of Giometti, Seaman and Rodman under all of the applicable provisions of the Colorado Rules of Professional Conduct.[5]  As stated above, this consideration is separate and apart from the recommendations regarding privilege and work product in this Report.  See Preamble to the Colorado Rules of Professional Conduct ("these Rules are not intended to govern or affect judicial application of either the attorney-client or work product privilege.").

In considering these issues, the Special Master has reviewed and gives particular regard to the purpose of these ethical standards, the policies that underlie them and the admonitions and advisements in the "Preamble" and "Scope" sections of the Colorado Rules of Professional Conduct. The Preamble eloquently sets forth the essential function of the rule of law in our society and the critical role of lawyers:

> The continued existence of a free and democratic society depends upon recognition of the concept that justice is based upon the rule of law grounded in respect for the dignity of the individual and each person's capacity through reason for enlightened self-government. Law so grounded makes justice possible, for only

---

[5]  See also CBA Ethics Opinion 91: "Ethical Duties of Attorney Selected by Insurer to Represent Insured," adopted 1/16/93, ("A lawyer retained by a liability insurance carrier to defend a claim against the company's insured must represent the insured with undivided fidelity. . . . "), supplementing Ethics Opinion 43: "Duty to Insured," 12/13/69; Addendum Issued 1995.

through such law does the dignity of the individual attain respect and protection. Without it, individual rights become subject to unrestrained power, respect for law is destroyed, and rational self-government is impossible.

Lawyers, as guardians of the law, play a vital role in the preservation of society. The fulfillment of this role requires an understanding by lawyers of their relationship with and function in our legal system. A consequent obligation of lawyers is to maintain the highest standards of ethical conduct.

The Special Master also notes, as set forth in the Scope, the significant distinction throughout the Rules between the Rules that are imperative, cast in the terms "shall" or "shall not," and those that are permissive, generally cast in the term "may." The permissive provisions define areas under the Rules of Professional Conduct in which lawyers have discretion, and the imperative provisions define proper and improper conduct for purposes of professional discipline.

The Special Master is bound by the Code of Conduct for United States Judge. See 1-17B(1). Pursuant to Canon 3B(3) of the Code: "A judge should initiate appropriate action when the judge becomes aware of reliable evidence indicating the likelihood of unprofessional conduct by a judge or lawyer."

The Special Master views his task to be that of identifying any rules of the Colorado Rules of Professional Conduct with respect to which, in his judgment, there is a substantial question as to whether the conduct at issue may have violated mandatory professional responsibilities. The limited purpose of this undertaking is to aid the Court to determine whether the Court should further consider any ethical issues that may warrant action. For guidance in undertaking this task, the Special Master looks to Rule 8.3, Reporting Professional Misconduct. That Rule states:

(a)      A lawyer having knowledge that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects shall

31

inform the appropriate professional authority.[6]

Further, addressing the attorney's duty of candor in <u>In re DeRose,</u> 55 P.3d 126, 131 (Colo.

2002), the Colorado Supreme Court stated as follows:

> Attorneys must adhere to high moral and ethical standards. Truthfulness, honesty, and candor are core values of the legal profession. Lawyers serve our system of justice as officers of the court, and if lawyers are dishonest, then there is a perception that the system must also be dishonest. Attorney misconduct perpetuates the public's misperception of the legal profession and breaches the public and professional trust.

(Citations omitted).

In this same vein, in <u>People v. Costa,</u> 56 P.3d 130, 135 (Colo. O.P.D.J. 2002), the Colorado

Supreme Court stated:

> An attorney's misrepresentation of material facts to a court with the aim of benefitting himself or others to the detriment of his adverse party cannot be tolerated under an adversary system which depends upon the honesty of its officers to render fair and just decisions. Judicial officers, members of the profession and the public at large must be able to rely upon the truthfulness of an attorney's statements to the court. Confidence in the truth-seeking process engendered in our system of justice cannot exist absent such reliance.

In making the determination whether a "substantial question" is presented, the Special

Master notes that the Comment to Rule 8.3 does not set forth the quantum of proof necessary to meet

this standard, but instead states:

> . . . A measure of judgment is . . .  required in complying with the provisions of this rule. The term 'substantial' refers to the seriousness of the possible offense and not the quantum of evidence of which the lawyer is aware.

The Committee Comment to Rule 8.3 does, however, provide guidance as to the quantum

---

[6] This Rule imposes a reporting obligation on the Special Master, who is an attorney licensed to practice in Colorado. The Special Master considers that the "appropriate professional authority" under the circumstances of this case is the Court, for the purpose of aiding the Court to determine whether further action is required.

of proof necessary for an attorney's "knowledge" that gives rise to a reporting obligation.  The

Committee Comment states:

> In recommending this rule, the Committee adopted the definition of knowledge contained in Restatement of Restitution, 10, Comment (d) (1937), similarly adopted in Colorado Bar Association Ethics Committee Opinion 64 (April 23, 1983) 'Knowledge means no substantial doubt.'

With these legal principles in mind, the Special Master has reviewed the conduct of

Giometti, Seaman and Rodman and sets forth his comments as to each of the separate Rules of

Professional Conduct that may be implicated.

### Rule 1.1   Competence

> A lawyer **<u>shall</u>** provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

(Emphasis supplied).

The Special Master believes there is a substantial question as to whether Giometti and

Seaman provided competent representation to State Farm.  In reaching this conclusion, the Special

Master has given great weight to the opinion letter of Mr. Laugesen and to Judge Perricone's Order

finding that the strategy that they developed and advised their client to pursue was the perpetration

of a fraud.

The Special Master further believes that there is a substantial question as to whether Rodman

provided competent representation to Thorne.  In reaching this conclusion, the Special Master notes

that as a consequence of Rodman's acts and omissions in his representation of Thorne, his client was

embroiled in litigation initiated by State Farm for nearly a year and suffered emotional distress.

### Rule 1.2   Scope of Representation

*        *        *

33

>    (d)     A lawyer **<u>shall not</u>** counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent, but a lawyer may discuss the legal consequences of any proposed course of conduct with a client and may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning or application of the law.

(Emphasis supplied).

The Special Master believes that there is a substantial question as to whether Giometti and Seaman both counseled and assisted State Farm to engage in conduct that they knew or should have known to be fraudulent. In reaching this conclusion, the Special Master has again given great weight to the opinion letter of Mr. Laugesen and to Judge Perricone's Order finding that the strategy that they developed and advised their client to pursue was the perpetration of a fraud.

The Special Master further believes that there is a substantial question as to whether Rodman violated this rule. While Rodman's client was Thorne, the facts and circumstances support the conclusion that Rodman was acting as State Farm's agent, elevating the interests of State Farm above the interests of his client. In that regard, the record that has been provided to the Special Master supports the conclusion that Rodman assisted State Farm to engage in conduct that Rodman knew or should have known to be fraudulent. In reaching this conclusion, the Special Master has again given great weight to the opinion letter of Mr. Laugesen and to Judge Perricone's Order.

### Rule 1.4   Communication

*        *        *

>    (b)     A lawyer **<u>shall</u>** explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

(Emphasis supplied).

The Special Master believes that there is a substantial question as to whether Giometti and Seaman explained to State Farm that the course of action they advised State Farm to take could

34

reasonably be viewed as the perpetration of a fraud.  In reaching this conclusion, the Special Master

has again given great weight to the opinion letter of Mr. Laugesen and to Judge Perricone's Order

finding that the strategy that they developed and advised their client to pursue was the perpetration

of a fraud.

Further, Rodman admits that he did not explain to Thorne the risks to him and the potential

consequences of his entering into the Bashor agreement, and, therefore, the Special Master believes

there is a substantial question as to whether this admitted failure to inform the client of these

potential consequences violated this Rule.

**Rule 1.7   Conflict of Interest**

(a)     A lawyer **<u>shall not</u>** represent a client if the representation of that client
will be directly adverse to another client, unless:

(1)     the lawyer reasonably believes the representation will not
adversely affect the relationship with the other client; and

(2)     each client consents after consultation.

(b)     A lawyer **<u>shall not</u>** represent a client if the representation of that client
may be materially limited by the lawyer's responsibilities to another client or to a
third person, or by the lawyer's own interests, unless:

(1)     the lawyer reasonably believes the representation will not be
adversely affected; and

(2)     the client consents after consultation. When representation of
multiple clients in a single matter is undertaken, the consultation shall
include explanation of the implications of the common representation and the
advantages and risks involved.

(c)     For the purposes of this Rule, a client's consent cannot be validly
obtained in those instances in which a disinterested lawyer would conclude that the
client should not agree to the representation under the circumstances of the particular
situation.

(Emphasis supplied).

The Special Master believes that there is a substantial question as to whether Rodman's long relationship with State Farm, including his direct attorney-client relationship with State Farm on a number of matters, with the financial benefits that Rodman received therefrom, materially limited his responsibilities to his other client, Thorne, and whether Rodman elevated the interests of State Farm above the interests of Thorne.  In reaching this conclusion, the Special Master notes that Rodman continued to represent Thorne after the Kaudy letter that put him on actual notice of the conflict between the interests of Thorne and State Farm.  Even assuming <u>arguendo</u> that this conflict was one that could be waived under this Rule, there is no dispute that Rodman did not obtain Thorne's informed consent to continue with the representation, as required by the Rule.

### Rule 1.8   Conflict of Interest: Prohibited Transactions

\*       \*       \*

(f)      A lawyer **<u>shall not</u>** accept compensation for representing a client from one other than the client unless:

(1)      the client consents after consultation;

(2)      there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and

(3)      information relating to representation of a client is protected as required by Rule 1.6.

(Emphasis supplied).

36

The Special Master believes that there is a substantial question as to whether Rodman's concerns for the interests of State Farm – the payer of his bills – interfered with both his independent professional judgment and his attorney-client relationship with Thorne.

### Rule 1.16   Declining or Termination Representation

a)      Except as stated in paragraph (c), a lawyer **shall not** represent a client or, where representation has commenced, shall withdraw from the representation of a client if:

(1)     the representation will result in violation of the rules of professional conduct or other law;

*        *        *

(Emphasis supplied).

The Special Master believes that there is a substantial question as to whether Giometti, Seaman and Rodman all knew or should have known that their conduct in pursuing the strategy that they developed would result in the violation of the Rules, as set forth herein, and the perpetration of a fraud, as found by Judge Perricone.

### Rule 2.1 Advisor

In representing a client, a lawyer **shall** exercise independent professional judgment and render candid advice. In rendering advice, a lawyer may refer not only to law but to other considerations such as moral, economic, social and political factors, that may be relevant to the client's situation. In a matter involving or expected to involve litigation, a lawyer should advise the client of alternative forms of dispute resolution which might reasonably be pursued to attempt to resolve the legal dispute or to reach the legal objective sought.

(Emphasis supplied).

The Special Master believes there is a substantial question as to whether Rodman violated this Rule by failing to exercise independent professional judgment and render candid advice to Thorne.  The Special Master further believes there is a substantial question as to whether Rodman's

conduct in his representation of Thorne was materially affected by his prior and ongoing relationship with State Farm.

### Rule 3.1 Meritorious Claims and Contentions

A lawyer **<u>shall not</u>** bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law. . .

(Emphasis supplied).

The Special Master believes that there is a substantial question as to whether Seaman and Giometti violated this Rule by the filing of the declaratory judgment action.  In reaching this conclusion, the Special Master has again given great weight to the opinion letter of Mr. Laugesen and to Judge Perricone's Order finding that the strategy that they developed and advised their client to pursue was the perpetration of a fraud.

### Rule 3.3 Candor Toward the Tribunal

(a)     A lawyer shall not knowingly:

(1)     make a false statement of material fact or law to a tribunal;

(2)     fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client.

*       *       *

(b)     The duties stated in paragraph (a) continue to the conclusion of the proceeding, and apply even if compliance requires disclosure of information otherwise protected by Rule 1.6.

(Emphasis supplied).

The Special Master believes that there is a substantial question as to whether Rodman violated Rule 3.3 in filing the stipulation for dismissal in the state court action, knowing that his client and Lee had not been informed of material facts before they entered into the Bashor agreement.

Further, the Special Master believes that there is a substantial question as to whether Seaman and Giometti violated this Rule in the filing of the declaratory judgment action and in their conduct in that action up through the withdrawal of their motion for partial summary judgment and their withdrawal as counsel.  In reaching these conclusions, the Special Master has again given great weight to the opinion letter of Mr. Laugesen and to Judge Perricone's Order finding that the strategy that these attorneys developed and pursued was the perpetration of a fraud.

### Rule 3.4   Fairness to Opposing Counsel

A lawyer **shall not**:

(a)     unlawfully obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value.  A lawyer shall not counsel or assist another person to do any such act;

(b)     falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law;

*        *        *

(f)     request a person other than a client to refrain from voluntarily giving relevant information to another party unless:

(1)     the person is a relative of a client or an employee or other agent of a client; and

(2)     the lawyer reasonably believes that the person's interests will not be adversely affected by refraining from giving such information.

(Emphasis supplied).

The Special Master believes that there is a substantial question as to whether Rodman unlawfully obstructed Lee's access to information that she needed to reasonably determine whether she should enter into the Bashor agreement.  In reaching these conclusions, the Special Master has again given great weight to the opinion letter of Mr. Laugesen and to Judge Perricone's Order finding that the strategy that these attorneys developed and pursued was the perpetration of a fraud.

### Rule 4.1 Truthfulness in Statements to Others

In the course of representing a client a lawyer **<u>shall not</u>** knowingly:

(a)     make a false or misleading statement of fact or law to a third person; or

(b)     fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by Rule 1.6.

(Emphasis supplied).

The Special Master believes that there is a substantial question as to whether Seaman, Giometti and Rodman violated this Rule in their actions and omissions in connection with the presentation of the Bashor agreement to both Lee and Thorne.  Again, in reaching these conclusions, the Special Master has given great weight to the opinion letter of Mr. Laugesen and to Judge Perricone's Order finding that the strategy that these attorneys developed and pursued was the perpetration of a fraud.

### Rule 5.4   Professional Independence of a Lawyer

\*        \*        \*

(c)     A lawyer **<u>shall not</u>** permit a person who recommends, employs or pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services.

(Emphasis supplied).

Again, as set forth above, the Special Master believes that there is a substantial question as to whether Rodman's concerns for the interests of State Farm – the payer of his bills – interfered with his independent professional judgment in representing Thorne.

**Rule 8.4   Misconduct**

It is professional misconduct for a lawyer to:

(a)  violate or attempt to violate the rules of professional conduct, knowingly assist or induce another to do so, or do so through the act of another;

(b)  commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(c)  engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

\*       \*       \*

(d)  engage in conduct that is prejudicial to the administration of justice;

(g)  engage in conduct which violates accepted standards of legal ethics; or

(h)  engage in any other conduct that adversely reflects on the lawyer's fitness to practice law.

(Emphasis supplied).

As set forth above, the Special Master believes that there is a substantial question as to whether Seaman, Giometti and Rodman engaged in misconduct within the meaning of this Rule. Again, in reaching these conclusions, the Special Master has given great weight to the opinion letter of Mr. Laugeson and to Judge Perricone's Order finding that the strategy that these attorneys developed and pursued was the perpetration of a fraud.

## V.  <u>RECOMMENDATIONS</u>

In applying the findings and conclusions enumerated above, the Special Master has reviewed each of the documents for which privilege is claimed.  The chart attached as Exhibit 1is a copy of the privilege log submitted by State Farm, with a column to denote the Special Master's recommendation that the subject document should be disclosed for any of the following grounds: the crime-fraud exception (CFE), the "at issue" waiver (AI), and/or insufficient description (ID). Alternatively, a recommendation that the subject document should not be disclosed is identified as privileged (P).

Dated this 4th day of June, 2007.


s/Shelley B. Don
Shelley B. Don, Special Master

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of June, 2007, a true and correct copy of the foregoing **SPECIAL MASTER'S REPORT AND RECOMMENDATIONS** was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

W. Randolph Barnhart
Angela L. Ekker
BARNHART, EKKER & MCNALLY, LLP
7887 E. Belleview, #1200
Englewood, CO 80111
Telephone: (303) 793-0700
FAX: (303) 793-1950
Email: rbarnhart@bemllp.com
Email: aekker@bemllp.com
*Attorneys for Plaintiff*

Alfred Frank Paoli, Jr.
PAOLI & BROWN, P.C.
120 West Callendar Street
Livingston, Montana 59047
Telephone: (406) 444-4420
FAX: (406) 222-1032
foaiku@bridgeband.com
*Attorneys for Plaintiff*

Richard Michael Kaudy
The Law Office of Richard M. Kaudy
1424 Larimer Street, Suite 301
Denver, CO 80202
Telephone: (303) 623-1885
FAX: (303) 623-1825
Email: rkaudy@kaudylaw.com
*Attorney for Plaintiff*

Jon F. Sands
Kimberle E. O'Brien
FISCHER, SWEETBAUM & LEVIN, P.C.
400 S. Colorado Blvd., Suite 900
Denver, CO 80246
Telephone: (303) 296-337
FAX: (303) 296-7343
Email: jsands@fslpc.com

Email: kobrien@fslpc.com
*Attorneys for Defendant*

Joseph F. Nistico, Jr.
NISTICO & CROUTCH, P.C.
5847 San Filipe, #3250
Houston, TX 77057
Email: jnistico@nisticocrouch.com
*Attorneys for Defendant*

s/Roberta Glaser
Roberta Glaser
DON, GALLEHER & SALIMAN, P.C.
